IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TROY M. RAPPA,

                        Plaintiff,                    OPINION AND ORDER

        v.                                                      10-cv-585-wmc

SUN LIFE ASSURANCE COMPANY
OF CANADA,

                        Defendant.

        After plaintiff Troy M. Rappa suffered through three back surgeries, multiple

prescriptions and subsequent rehabilitation, Rappa's employer submitted a claim on his

behalf to defendant Sun Life Assurance Company of Canada.   After finding Rappa

eligible for benefits for two years because he could not return to his former occupation,

Sun Life ultimately found that Rappa was not "Totally Disabled" as that term is defined

in the relevant plan documents and denied further benefits because he could perform

other, sedentary work.   In this action, Rappa now claims that Sun Life's denial of long-

term disability and life insurance benefits violated the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*.   Both parties have moved for summary

judgment.   (Dkt. ##41, 46.)   Because the court finds that no reasonable view of the

evidence supports Sun Life's determination that Rappa could perform a gainful

occupation on a full-time basis -- a necessary finding for purposes of denying benefits --

the court will grant summary judgment to Rappa and remand this case to Sun Life for

further review.

PRELIMINARY MATTERS

Before turning to the parties' summary judgment motions, the court must first address two pending motions to strike.  In the first, Sun Life seeks to strike certain materials submitted from outside of the administrative record.  (Dkt. #71.)  In response, plaintiff argues that these materials were simply submitted to rebut certain of Sun Life's proposed findings of fact, not to support plaintiff's motion for summary judgment. Plaintiff fails to explain why this should make any difference given the restrictions of the scope of this court's review.  Regardless, the court's review is necessarily limited to the evidence contained in the administrative record.  *See Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999).  Accordingly, the court will grant defendant's motion to strike.

In the second motion, plaintiff seeks to strike Sun Life's additional proposed findings of facts and declaration of Morse W. Doane, both of which were submitted with Sun Life's reply brief in support of its motion for summary judgment.  (Dkt. #73.)  Sun Life responds that these supplemental proposed findings of fact and the Doane Declaration were both necessary to reply to arguments raised for the first time in plaintiff's response to its motion for summary judgment.  Although none of the proposed facts are material to the court's holding today, the court agrees with defendant that these proposed findings and the declaration address arguments raised in plaintiff's response brief.  Accordingly, the court will deny plaintiff's motion.[1]

---

[1] If plaintiff believed he was prejudiced by defendant's filing, the proper course would have been for plaintiff to seek leave to file a sur-reply to the proposed findings of fact.

UNDISPUTED FACTS[2]

**A. The Parties**

Plaintiff Troy M. Rappa was an employee of Wisconsin Metal Fab, Inc. ("WMF") from April 20, 2005, to November 30, 2007, most of that time as a shop floor supervisor. Defendant Sun Life Assurance Company of Canada ("Sun Life") provided group term insurance to WMF during the course of Rappa's employment.

**B. The Policy**

In 2003, Sun Life issued Group Term Insurance Policy Number 88319 (the "Policy") to WMF. This Policy was renewed for each of the three years Rappa was employed by WMF. The terms of the Policy were substantially the same for the entire three-year period.

Among other benefits, the Policy provided group long term disability insurance coverage ("LTD") and group life insurance coverage to WMF employees, such as Rappa. Upon establishing proof of Total Disability as defined by the Policy, LTD coverage for eligible employees would pay an amount equal to 60% of their total monthly earnings with a maximum benefit of $3,000 per month. LTD coverage also included a waiver of life insurance premium ("LWOP") benefit. Both LTD benefits and LWOP benefits

---

Presumably plaintiff did not do so because he, too, views the proposed additional facts to be immaterial, has no further retort, or both.

[2] The court finds the following facts taken from the parties proposed findings of fact to be material and undisputed.

terminate on the date the employee was no longer Totally Disabled.  Under the Policy,

"Total Disability" or "Totally Disabled"

> means during the Elimination Period and the next 24 months, the Employees, because of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation.  After Total or Partial Disability benefits combined have been paid for 24 months, the Employee will continue to be Totally Disabled if he is unable to perform with reasonable continuity any Gainful Occupation for which he is or becomes reasonably qualified for by education, training or experience.

(Declaration of Amy L. Vandamme ("Vandamme Decl."), Ex. G ("2007 Policy") (dkt.

#48-19) 20.)[3]   In a separate provision of the Policy, defining termination of LTD

benefits, the Policy also provides in pertinent part:

> Total or Partial Disability Benefits will cease on the earliest of . . . after the first 24 months of Total or Partial Disability, the date Sun Life determines the Employee is able to perform on a full-time basis, any Gainful Occupation for which he is or becomes reasonably qualified for by education, training or experience, even if the Employee chooses not to work.

(*Id.* at 44-45.)

Said somewhat more simply, the Policy pays LTD benefits for 24 months to

employees who cannot perform their "Own Occupation," which is defined as the

employee's particular occupation at the time of his disability.  Thereafter, the Policy

continues to pay LTD benefits only if the claims administrator determines that the

employee could not perform any "Gainful Occupation," which is defined as "employment

that is or can be expected to provide an Employee with an income of at least 60% of his

---

[3] Given that Rappa was injured in 2007, the court will cite to the Policy effective December 1, 2006, which the court and the parties refer to as the "2007 Policy".

Indexed Total Monthly Earnings." (*Id.* at 17.)  For purposes of determining eligibility for an LWOP benefit, "Total Disability" or "Totally Disabled" is defined as "an Employee, because of Injury or Sickness, is unable to perform the material and substantial duties of *any occupation* for which he is or becomes reasonably qualified for by education, training or experience." (*Id.* at 13 (emphasis added).)  The parties agree that this definition is substantially the same as the "any Gainful Occupation" section applicable to LTD benefits.

## C. Delegation of Authority

According to the most recent Summary Plan Description ("SPD"), the Plan Sponsor and Plan Administrator is Rappa's employer, WMF.  The SPD does not confer any authority on the Plan Administrator to delegate any of its authority to a third party. The Policy, however, states that:

> The Plan Administrator has delegated to Sun Life its entire discretionary authority to make all final determinations regarding claims for benefits under the benefit plan insured by this Policy.  This discretionary authority includes, but is not limited to, the determination of eligibility for benefits, based upon enrollment information provided by the Policyholder, and the amount of any benefits due, and to construe the terms of this Policy.

> Any decision made by Sun Life in the exercise of this authority, including review of denials of benefit, is conclusive and binding on all parties.  Any court reviewing Sun Life's determinations shall uphold such determination unless the claimant proves Sun Life's determinations are arbitrary and capricious.

(2007 Policy (dkt. #48-19) 60.)

5

### D. Summary of Rappa's Injury

Rappa's back problems began in 2002 when he slipped and hurt his back while carrying a box.  Rappa was diagnosed with a herniated disc.  A lumbar discectomy was performed in 2002 at L5-S1.  Approximately two year later, Rappa reinjured his back and was again diagnosed with a herniated disk.  On November 15, 2004, Rappa underwent a second disc surgery.

In October 2007, Rapa reinjured his back.  At that time, Dr. Rao found (1) a disc space had collapsed and (2) severe scar tissue around the left S1 nerve.  Rappa was referred to Dr. Dillon and Dr. Va to attempt conservative management of the pain.  After various attempts at pain management failed, Rappa underwent an L5-S1 anterior discectomy and interbody fusion on February 11, 2008.  As a result of this third back surgery, Dr. Dillon wrote in a case management note dated June 5, 2008, that Rappa's back was "80% better than before surgery."  (Vandamme Decl., Ex. B, part 8 (dkt. #48-9) SL001118.)

### E. Rappa's Initially-Successful Disability Claim

Rappa's claim for disability began on December 1, 2007, and related to a diagnosis of an L5-S1 anterior tear.  WMF made a claim for LTD coverage on Rappa's behalf on January 21, 2008.  Sun Life determined that Rappa was Totally Disabled as defined by the Policy because Rappa could not perform his "own occupation" at WMF. Accordingly, Sun Life approved Rappa's claim and notified him in a letter dated February

27, 2008.  Sun Life also approved Rappa's claim for LWOP benefits via letter dated April 14, 2008.

### F.  Treating Physician's Post-Claim Care

In July 2008, Rappa took part in a Functional Capacity Examination ("FCE"), during which he demonstrated an ability to frequently lift up to 20 pounds.  Based on the FCE, Rappa's physicians approved him for a "work hardening" program around this same time.  The parties' dispute whether Rappa actually took part in such a program, but agree that regardless, on September 2, 2008, Rappa reported that he had gone back to narcotic pain patches to compensate for increased pain.  In response, Dr. Dillon gave Rappa a note to be off work.

On October 3, 2008, Rappa visited Dr. Carlson, who increased his pain medication prescription.  In October 2008, Dr. Dillon sent a note to a loan officer explaining that "Mr. Rappa has had multiple back surgeries and . . . [has] severe chronic radicular pain," "has been using pain medications, . . . [and] left foot drop requiring bracing."  As a result, Dr. Dillon opined that Rappa was "[p]resently, . . . unable to work, and unless his condition would improve, I would not anticipate him returning to work." (Vandamme Decl., Ex. B, part 9 (dkt. #48-10) SL001168.)  On November 25, 2008, Rappa again saw Dr. Dillon for a fitness evaluation.  Dillon observed that Rappa appeared to be limping more that day and had numbness and tingling in the left lower extremity.  Dillon also notes Rappa has difficulty sleeping due to pain, has memory and

concentration issues, and will "remain off work."  (Vandamme Decl., Ex. B, part 9 (dkt. #48-10) SL001175.)

From February through May 2009, Rappa visited Dr. Carlson each month for follow-up of his chronic back pain.  Carlson noted that Rappa seemed to be more comfortable standing, than sitting, and noted stiffness arising from a chair.

In May 2009, Rappa also visited Dr. Rao to assess back and leg pain.  On May 22, 2009, Rao noted that Rappa had chronic left leg pain which was disabling, but noted significant improvement with regard to his pre-surgery back pain.  That same day, Rappa also visited Dr. Dillon for a fitness evaluation, who noted that Rappa had chronic radicular pain with left footdrop and hip pain over the right trochanter.  Dillon further noted that Rappa (1) was using a Fentanyl patch and Gabapentin, and (2) reported more pain lately.  Dillon felt that Rappa's condition was getting worse.  Finally, Dillon noted memory and concentration problems.

On June 6, 2009, Rappa visited Dillon again, reporting that he was experiencing increased back pain and that he could not bend over very far.  Dillon adjusted his Fentanyl prescription and administered an injection to address his hip bursa.  Rappa also saw Dr. Carlson again in July and early August, who noted that Rappa walks stiffly, but his back pain is "reasonably well-controlled with his Fentanyl patch."  (Vandamme Decl., Ex. B, part 9 (dkt. #48-10) SL001207.)

On October 5, 2009, Rappa met with Dr. Panna Varia for disability issues.  Dr. Varia noted Rappa continued to have back pain, which has improved since his surgery in 2008.  Varia also noted that Rappa reported (1) pain in the left sole of his foot; (2)

feeling an electric shock-like feeling in his left leg that peaks at 10; (3) more pain lately and felt he was getting worse; and (4) the medications did not remove the pain and that he felt they affected his memory and concentration. Varia opined at the time that Rappa "is not released for work."

On October 14, 2009, Rapa again saw Dr. Carlson. Carlson noted that Rappa was receiving a pretty high dose of Fentanyl but reported not feeling it was as helpful as it could be. Rappa saw Carlson again in November. The record reflects that Rappa was off the Fentanyl and now on oxycodone. Dr. Carlson noted that Rappa "seems to be doing pretty well." Carlson, however, noted that Rappa arises from a chair stiffly and that his low back appears rather stiff with loss of some normal lumbar lordosis.[4] Carlson increased his dosage of Oxycontin.

### G. Sun Life's Review of Rappa's Medical Record

On September 18, 2008, Rappa was referred to Bruce Hoffman for a "RTW [Return to Work] Readiness Review." Hoffman concluded that "[m]edical information is not supporting of work capacities. . . . Once medical information is supportive of work function, voc would be interested in revisiting the Insured's appropriateness for [right to work] interventions." (Vandamme Decl., Ex. B, part 4 (dkt. #48-5) SL000482.)

On January 30, 2009, Rappa was seen by Dr. Sridhar V. Vasudevan for an independent medical evaluation, requested by Sun Life. Vasudevan obtained Rappa's

---

[4] "Lordosis is the inward curvature of a portion of the lumbar and cervical vertebral column." Lordosis, Wikipedia, http://en.wikipedia.org/wiki/Lordosis (last visited September 18, 2013).

medical history and examined him for the purpose of disability assessment.   Dr. Vasudevan diagnosed Rappa as having (1) degenerative disc disease of the lumbosacral spine; (2) status post L5-61 discectomy in 2002; (3) status post L5-S1 discectomy on the left on November 15, 2004; (4) status post anterior lumbar interbody fusion, February 11, 2008; and (5) mechanical and neuropathic pain left lower extremity and lumbar spine secondary to the above with severe neuropathic pain in the L5-S1 distribution and the footdrop, all secondary to the above conditions.   Dr. Vasudevan also noted Rappa's abnormal gait pattern, and specifically stated that "[w]ithout the ankle foot orthosis, his gait is extremely unstable and unsafe.   Even with the ankle foot orthosis, gait is rather unsafe and slow."  (Vandamme Decl., Ex. B, part 5 (dkt. #48-6) SL000618.)

In response to the question, "Can this examinee return to [his] own occupation?", Vasudevan responded in bold, "He definitely cannot return to this work, given his physical impairments and resultant restrictions."  (*Id.*)  In response to the question, "Can this examinee return to any occupation?", Dr. Vasudevan responded,

> Although physically he demonstrated the ability to perform a light level of work in an FCE, at the current time he, in my opinion, cannot work in a competitive setting.   With his numerous medications, and his severe footdrop, he would be extremely unsafe, unreliable and unstable.
>
> However, I believe that following the stimulator placement, he will most likely be able to work in a limited capacity.

(*Id.* at SL000618-19.)   Vasudevan also noted that Rappa "has appropriate pain behaviors, and there is no evidence of symptom magnification."  (*Id.* at SL000619.)

Dr. Vasudevan also completed an "Estimated Functional Capacity Form" in which he noted that Rappa was not able to return to work, but that "with appropriate

10

treatment, training and placement," Vasudevan filling in that Rappa could: (1) sit for 5-6 hours; (2) stand for 1 hour; (3) walk for 1 hour (with breaks); and (4) alternate between sitting, standing and walking for 2-3 hours.  (*Id.* at SL000621.)  On the form, Vasudevan also noted that Rappa may be able to work full time with "treatment of pain, selective training and vocational placement."  (*Id.* at SL000622.)

Sun Life also requested that Dr. Howard Taylor, a board certified orthopedic surgeon, review Rappa's records, Dr. Vasudevan's IME report and a surveillance report of Rappa completed by Jeffrey J. Johnson of Claims Bureau USA based on surveillance conduct in April 2009.  (Vandamme Decl., Ex. T (dkt. #48-32).)  Taylor noted that the surveillance showed Rappa "walking a short distance with a limp, driving, pumping gas and wheeling a trash container in from the curb."  (*Id.* at 4.)[5]  Taylor concluded that "[t]hese activities are consistent with his reported activity level."  (*Id.*)  Taylor also opined that the medical records support a finding that Rappa could sit for 5 to 6 hours a day, but would need to be restricted from walking or standing for more than 30 minutes at a time and from any climbing.  Taylor also concluded that based on his review of the medical records Rappa's "back pain is not a major issue and the fusion is healed.  His major issue now is the pain in the leg and this would preclude sustained weight bearing."  (*Id.*)

In October 2009, Sun Life requested Mary P. O'Malley, MA, CRC, CCM, conduct a vocational review based on the Hoffman vocational review and the reports

---

[5] Taylor's summary of the report is consistent with the details in the report itself.  (*See* Vandamme Decl., Ex. R (dkt. #48-30).)  The court discusses Sun Life's surveillance of Rappa and its reliance on the surveillance in denying his benefits in the opinion below.

completed by Dr. Taylor and Dr. Vasudevan, among other information.  (Vandamme Decl., Ex. U (dkt. #48-33).)  O'Malley concluded:

> Vocational alternatives have been identified that appear to be consistent with Mr. Rappa's education, work experience and skills.  They are sedentary occupations that involve occasional standing and walking and typically provide the opportunity to intermittently change positions during the work day.  They can be learned through on the job training.

(*Id.* at 5.)

In December 2009, Dr. Taylor revised his medical consultant review report to limit standing or walking to 15 minutes at a time in light of the Dr. Varia's reporting more complaints of radicular pain.  (Vandamme Decl., Ex. V (dkt. #48-34).)   On February 19, 2010, Sun Life also referred Rappa's claim to Lorett Dionne, RN, for an opinion as to whether Rappa's use of certain pain medications would preclude him from performing sustained sedentary function.   (Vandamme Decl., Ex. W (dkt. #48-35.)  After reviewing Rappa's record, Dionne concluded, "I do not have any recent mentation exam . . . noting a cognitive issue or any type of cognitive d[y]sfunction that would preclude the claimant from performing sustained sedentary function."  (*Id.* at 3.)

Sun Life also requested that O'Malley update her vocation report in light of Taylor's revised report and the medical consultant review completed by Dionne. (Vandamme Decl., Ex. Y (dkt. #48-36).)  In February 2010, O'Malley concluded:

> the previously identified occupations continue to be appropriate vocational alternatives that appear to be consistent with Mr. Rappa's skills, education and work experience. They are sedentary occupations that typically involve occasional walking and standing. The identified occupations also typically provide the opportunity to intermittently change positions during the workday.

> Telephone headsets can be used for those occupations involving telephone work which provide for greater flexibility of movement while continuing to perform related job duties. It is expected, with reasonable vocational certainty, that standing and walking for greater than 15 minutes at a time are not required to perform the identified sedentary occupations. Repetitive bending and twisting are not typically required to perform these occupations. The identified occupations can be learned through on the job training.

(*Id.* at 3.)

### H.  Rappa's Disability Challenge

In a twelve-page letter dated March 1, 2010, Sun Life notified Rappa that his LTD "benefits beyond February 28, 2010 have been denied."  (Vandamme Decl., Ex. I (dkt. #48-21) 2.)[6]  "Based on our review," Sun Life explained, "you have the ability to perform sustained sedentary function in any Gainful Occupation."  (*Id.*)  Consistent with its treatment of Rappa's LTD claim, Sun Life also terminated Rappa's LWOP benefit by letter dated February 9, 2010.  The letter advised Rappa that he "no longer qualif[ied] for [his LWOP] benefit because [he was] no longer Totally Disabled as defined by the Group Policy referenced below."  (Vandamme Decl., Ex. CC (dkt. #48-41) 2.)  Both termination letters provided the key terms and definitions of the Policy, explained Rappa's claim history, and summarized Sun Life's medical reviews, including the findings of its independent medical evaluation conducted by Dr. Taylor and vocational

---

[6] The parties dispute whether Rappa was informed of Sun Life's decision in an earlier telephone conversation, but this is not material to the present motions.

rehabilitation reviews by Mary O'Malley.  (*Id.* at 1-13.)   The letters also outlined the appeal process.

Rappa timely appealed Sun Life's decisions to deny his LTD and LWOP benefits claim.  (Vandamme Decl., Ex. B, part 10 (dkt. #48-11) 9; *id.*, Ex. DD (dkt. #48-42).)[7] Among other reasons, Rappa sought appeal of Sun Life's denial because:

> [a]fter repeated attempts to control the pain with physical therapy and non-narcotic pain medication to no avail, I use a plethora of medication including heavy doses of narcotic medication and non-narcotic medication with severe side effects. . . . [T]he narcotic medication leaves me feeling drunk without the sick feeling.  My memory is so bad my family no longer trust[s] me and is continuously making sure I've done what I was suppose[d] to do.  I am no longer allowed to drive due to my Dr.'s advice and my physical activity is very limited before I have to stop and lie down to get the pain to a manageable letter.

(*Id.*)   Rappa did not, however, submit any further medical proof of his disability in support of his appeal.

In response, Sun Life referred Rappa's file to Dr. James A. K. Lambur for an independent medical review of Rappa's claim file on April 19, 2010.  (Vandamme Decl., Ex. AA (dkt. #48-39).)   Dr. Lambur's list of "documents reviewed" does not contain Dr. Vasudevan's IME report, Dr. Taylor's December 2009 report, or more recent reports from Dr. Dillon.  (*Id.* at 2-3.)[8]   According to Dr. Lambur, the only "restrictions and

---

[7] Plaintiff also challenges Sun Life's calculation of his indexed total monthly earnings. The court need not recount these facts and the parties' dispute in light of its holding that Sun Life's denial of Rappa's disability benefits was arbitrary and capricious.

[8] Despite this, Sun Life still argues that Dr. Lambur may have reviewed these other medical records.  Given Dr. Lambur's detailed listing of the records he actually reviewed in rendering his opinion, it would be a matter of unreasonable speculation to assume that

limitations per attending physician(s)" was Dr. Dillon's statement on October 8, 2008, that Rapa was "unable to work.' (*Id.* at 3.)  In his review of Rappa's medical record, Dr. Lambur noted a "six month hiatus" had occurred from November 2008 to May 2009 of treatment episodes, despite the record reflecting Rappa's monthly appointments with Dr. Carlson during this time period.

Based on his review, Dr. Lambur issued a report dated May 4, 2010, which concluded as follows:

> There is no supporting evidence in the records reviewed to validate claimant's ongoing request for off work status and this reviewer is unable to identify any significant functional impairment as of 3/1/10. The available medical proof does not substantiate the level of impairment claimed by Mr. Rappa in his letters of 2/20/10 and 3/4/10. As of March 1, 2010, it is reasonable to assume that Mr. Rappa is well able to engage in a sedentary occupation for a full eight hour period.    During this period, there should be allowed occasional intermittent opportunities for position change, however, claimant is well able to walk for 40 to 60 minutes at a time, for a period of four to five hours a day, this limitation being due to possibility, high probability indicated in record review of slight foot drop on the left. The claimant should not be required to lift in excess of 20 pounds floor to waist due to presence of anterior and posterior lumbar fusion. This reviewer does not believe that the record supports chronic debilitating left leg pain without relief from medication. There is no indication that Mr. Rappa was experiencing severe functional impairment due to medication side effects on around 3/1/10. There is no medical reason why Mr. Rappa would have been unable to perform full time, sedentary, light medium activity as of 3/1/10. Exertion level would be moderate, and to exclude lifting over 20 pounds floor to waist with ready opportunity for prolonged alternating positions, sitting to standing with relative frequency (e.g., 2x/hr).

---

he reviewed other medical records, but failed to include them in his list, including evaluations from other doctors Sun Life retained to examine Rappa.

(*Id.* at 4-5.)

Relying almost exclusively on Dr. Lambur's conclusion that the medical records did not support Rappa's claim of total disability for any job, Sun Life then notified Rappa in a letter dated May 6, 2010, that his appeal of its initial decision to deny his LTD claim was denied.  (Vandamme Decl., Ex. BB (dkt. #48-40).)  Sun Life explained that

> [b]ased on our review of your entire file, including the result of Dr. Lambur's independent medical assessment, the proof does not substantiate that, as of March 1, 2010, you were unable to perform with reasonable continuity any gainful occupation for which you were reasonably qualified.  Rather, the proof supports that, even if you have some level of ongoing pain and mobility limitation, you still have the ability to perform full-time sedentary work activity and you are qualified to perform several gainful sedentary occupations. Therefore you were no longer disabled as defined by the policy on March 1, 2010, and the decision to terminate benefits was correct.

(*Id.* at 5.)  For essentially the same reasons, Sun Life also notified Rappa of its final decision to deny his LWOP claim via letter dated May 7, 2010.  (Vandamme Decl., Ex. EE (dkt. #48-43).)

OPINION

## I.  Standard of Review

This court reviews an administrator's decision to deny eligibility for ERISA insurance plan benefits under the arbitrary and capricious standard.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010).  While this standard of review is obviously highly deferential, the Seventh Circuit has cautioned that the court is not a "rubber stamp." *Holmstrom*, 615 F.3d at 766.[9]  "For ERISA purposes, the arbitrary and capricious standard is synonymous with abuse of discretion."  *Id.* at 767 n.7 (internal citation, quotation marks and alterations omitted).

ERISA requires that "the administrator . . . weigh the evidence for and against [the denial of benefits], and within reasonable limits, the reasons for rejecting evidence must be articulated if there is to be meaningful appellate review."  *Halpin v. W.W. Grainger*, 962 F.2d 685, 695 (7th Cir. 1992) (internal citation and quotation marks omitted).  The court will, therefore, uphold an administrator's decision "if (1) it is possible to offer a

---

[9] In some cases, the Seventh Circuit has stated that the decision must be "downright unreasonable" before reversal by a federal court would be appropriate.  In *Holmstrom*, however, the court clarified that statement, explaining that the standard of review:

> should not be understood as requiring a plaintiff to show that only a person who had lost complete touch with reality would have denied benefits.  Rather, the phrase is merely a shorthand expression for a vast body of law applying the arbitrary-and-capricious standard in ways that include focus on procedural regularity, substantive merit, and faithful execution of fiduciary goals.

615 F.3d at 766 n.5.

reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem." *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 686 (7th Cir. 2004) (internal quotation marks and citations omitted).[10]

The court is mindful that defendant here serves a dual function in having "both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)). This "conflict of interest" does not alter the standard of review -- the abuse of discretion standard still applies -- but is "weighed as a factor in determining whether there is an abuse of discretion." *Glenn*, 554 U.S. at 115 (citing *Firestone*, 489 U.S. at 115) (quotation marks omitted); *see also Holmstrom*, 615 F.3d at 766 (describing this factor as a "key consideration").

Rappa contends that Sun Life's coverage determinations must be considered *de novo*, because the Summary Plan Documents ("SPD") do not contain a grant of discretionary authority. Rappa, however, fails to cite to any support for this proposition.

---

[10] In reviewing a denial or termination of benefits, there are also two core procedural requirements under ERISA: (1) "that specific reasons for denial be communicated to the claimant"; and (2) "that the claimant be afforded an opportunity for a 'full and fair review' by the administrator." *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003) (quoting *Halpin*, 962 F.2d at 688-89); *see also* 29 U.S.C. § 1133. Substantial compliance with these two requirements is sufficient to satisfy ERISA. *Hackett*, 315 F.3d at 775; *Halpin*, 962 F.2d at 690. Here, plaintiff does not appear to allege a procedural challenge. Even if he had, the court finds that the record would not support such a challenge.

In any event, the group insurance policy itself contains an express grant of discriminatory authority to Sun Life, and Rappa does not dispute that a group insurance policy, like the one issued by Sun Life here, *is* a plan document. *See Sperandeo v. Lorillard Tobacco Co., Inc.*, 460 F.3d 866, 870 (7th Cir. 2006).   Accordingly, the court reviews Sun Life's decision to terminate Rappa's benefits under the arbitrary and capricious standard of review, mindful of the conflict of interest created by Sun Life's dual role.

## II. Review of Denial Decision

Sun Life contends that its decision denying further benefits under the Plan was not an abuse of discretion because it (1) offered a reasoned explanation based on the evidence; (2) based its decision on a reasonable explanation of relevant plan documents; and (3) based its decision on the relevant factors surrounding the decision.   (Def.'s Opening Br. (dkt. #47) 15-18.)   In response, plaintiff lobs several bases for finding reversible error in Sun Life's decision.   Because it is dispositive, the court will here focus on Sun Life's finding that Rappa could work on a full-time basis.

As described above, the plan allows for termination of LTD benefits if an employee "is able to perform on a full-time basis, any Gainful Occupation."  (2007 Policy (dkt. #48-19) 44-45.)   The plan defines "full-time basis" as the number of hours the employee normally performed his own occupation prior to his disability, not to exceed 40 hours per week.  (Vandamme Decl., Ex. B, part 1 (dkt. #48-2) SL000099.)

Sun Life contends that it relied on four separate reviews of Rappa's medical file, surveillance observations, and an independent medical examination, but this is not

19

entirely accurate.  While all of this material might have factored into its decision, Sun Life's critical conclusion that Rappa could work full time is based entirely on Dr. Lambur's report.  None of the other reports from any of the other physicians that Sun Life retained to review Rappa's medical records support such a conclusion.  On the contrary, Dr. Vasudevan -- who actually met with Rappa and observed his condition first-hand -- opines that Rappa could not work at all given his condition at the time of Vasudevan's report.  Relying on Dr. Vasudevan's conclusion, Dr. Taylor found that Rappa may be able to work *in the future* provided certain medical treatment, but stops short of concluding that Rappa could work full time.[11]  Dr. Taylor further acknowledges in his second report that Rappa's condition is deteriorating. (Vandamme Decl., Ex. B, part 9 (dkt. #48-10) SL001224.)

As plaintiff points out, Dr. Lambur's list of documents reviewed in rendering his conflicting conclusion fails to contain or explain several critical documents.  In particular, it appears Dr. Lambur did not review or consider the most recent records of Rappa's treating physicians, Dr. Vasudevan's independent medical examination report, or Dr. Taylor's second report, which acknowledges Rappa's increased pain after review of more recent treatment notes.

---

[11] To the extent Dr. Taylor's opinion that Rappa could sit for five to six hours at a time could be construed as support that he could *work* full time (*i.e.*, an eight hour day), Taylor's only basis for that opinion is his reliance on Dr. Vasudevan's conclusion that, with proper treatment, Rappa may be able to work full time.  The record, however, contains *no* evidence that Rappa actually *received* the spine stimulator treatment or other treatments Dr. Vasudevan believed may have enabled him to work full time.  Indeed, defendant points to a doctor's note indicating that Rappa rejected these treatments.  Sun Life did not rely on Rappa's rejection as a basis for finding him not Totally Disabled under the policy.

Based on his own, more limited review of the medical record, it is true Dr. Lambur found "[a]s of March 1, 2010, it is reasonable to assume that Mr. Rappa is well able to engage in a sedentary occupation for a full eight hour period," but Lambur fails to cite to *any* support for this conclusion, other than his own general observation that there is "no supporting evidence in the records" for Rappa's disability claim.  (Vandamme Decl., Ex. AA (dkt. #48-39) 4.)  The fact that Dr. Lambur failed to review all the relevant records, coupled with his failure to provide any basis for discounting Rappa's treating physicians' notes, calls into question his ultimate conclusion.  Indeed, other courts have similarly questioned Dr. Lambur in particular for the weakness of his analysis and opinions.  *See, e.g., Demaree v. Life Ins. Co. of N. Am.*, 789 F. Supp. 2d 1002, 1016-17 (S.D. Ind. 2011) ("Dr. Lambur does not point to anything in the record that supports his opinion that Demaree can perform sedentary work and does not explain how he arrived at that opinion. Instead, Dr. Lambur spends the bulk of his report pointing out things that he believes are absent from the record, without explaining why those absences are significant."); *LaCosse v. Sun Life Fin. Servs. Co., Inc.*, No. 2:10-cv-56, 2011 WL 4036673, at *18 (W.D. Mich. Sept. 12, 2011) (calling into question Dr. Lambur's credibility determination of the claimant).

In its briefs, defendant Sun Life relies heavily on surveillance videos of Rappa collected from March 31, 2009, to July 24, 2009, and for which it paid over $8,000. Defendant argues that these videos undermine Rappa's credibility, having testified:  that he "hardly never" drives; on a typical day only gets up, takes medications and goes back to bed; and does not go out of his home often.  (Def.'s Resp. to Pl.'s Add'l PFOFs (dkt.

21

#70) ¶ 31.)  In fact, the surveillance snippets collected over this nine-day period simply show that he, at times, walked short distances with a limp around his yard, drove his car, and pumped gas.  As Sun Life's own physician consultant conceded, "[t]hese activities are consistent with his reported activity level."  (Vandamme Decl., Ex. T (dkt. #48-32) 4.)  Indeed, none of the snippets on which Sun Life purports to have relied contradicts Rappa's testimony about the limits of his activities, nor do the snippets support Sun Life's finding that Rappa could work eight hour days.  *See Marantz v. Permanente Med. Grp., Inc. Long Term Disability Plan*, 687 F.3d 320, 329-30 (7th Cir. 2012) ("[W]here the evidence obtained during surveillance is not inconsistent with the claimant's own account of her activities, then it is of limited utility.").  If anything, Sun Life's significant investment both in time and money to conduct surveillance on Rappa raises questions about its conflict of interest here, as well as more telling that Sun Life essentially came away with no "smoking gun" after nine days of surveillance.  Regardless, the surveillance video provides no support for Dr. Lambur's and Sun Life's similar conclusion that Rappa could now work eight hour days.

Because Sun Life's only basis for finding that Rappa could work full time is Dr. Lambur's conclusory opinion and the surveillance videos, the court finds that it is not "possible to offer a reasoned explanation" for Sun Life's determination that Rappa can work full time, particularly in light of the inherent conflict of interest due to Sun Life's dual role.  *See Militello*, 360 F.3d at 686; *see also Demaree*, 789 F. Supp. 2d at 1019 ("Inasmuch as the only rationale given by LINA for its decision was Dr. Lambur's report,

LINA's decision was arbitrary and capricious."). Accordingly, the court concludes that Sun Life acted arbitrarily and capriciously in terminating Rappa's benefits.

Having found a violation of ERISA, this court is directed by the Seventh Circuit to focus on the "claimant's benefit status prior to the denial" to determine the appropriate remedy. *Holmstrom*, 615 F.3d at 778 (citing *Schneider v. Sentry Grp. Long Term Disability Plan*, 422 F.3d 621, 629 (7th Cir. 2005)). The goal is to "restor[e] the *status quo* prior to the defective proceedings." *Schneider*, 422 F.3d at 629; *see also Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003). Here, Sun Life granted LTD benefits to Rappa in February 2008 under the initial 24-month "own occupation" period. At the time those benefits expired, Sun Life denied Rappa continued benefits past the initial 24-month period under the "other occupation" provision.

The Seventh Circuit has held that this determination constitutes a denial, rather than a termination of benefits, requiring remand, rather than reinstatement of benefits. *See Pakovich v. Broadspire Servs., Inc.*, 535 F.3d 601, 607 n.3 (7th Cir. 2008) (finding remand appropriate where "the status quo, prior to Broadspire's termination of Pakovich's benefits, was only her receipt of 24 months' disability under the 'own occupation' standard") (citing *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 477-78 (7th Cir. 1998)). Therefore, the court will order this action remanded to Sun Life for further action consistent with this court's opinion.

ORDER

IT IS ORDERED that:

1)  Defendant Sun Life Assurance Company of Canada's motion to strike (dkt. #71) is GRANTED;

2)  Plaintiff Troy M. Rappa's motion to strike (dkt. #73) is DENIED;

3)  Plaintiff's motion for summary judgment (dkt. #41) is GRANTED;

4)  Defendant's motion for summary judgment (dkt. #46) is DENIED;

5)  Plaintiff's disability claim is remanded for further review; and

6)  The clerk of the court is directed to enter judgment in favor of plaintiff and close this case.

Entered this 18th day of September, 2013.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge